BARBER *v.* STATE

[No. 26, October Term, 1948.]

556

558

*Decided December 8, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Louis S. Ashman,* with whom was *Harry D. Barnes* on the brief, for the appellant.

*Harrison L. Winter, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General,* and *Henry L. Constable, State's Attorney for Cecil County,* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

Spurgeon Barber, Jr., an ex-paratrooper 21 years of age, and Alfred Irvin Holmes, were jointly indicted on March 2, 1948, for assaulting and robbing George Hamilton, paymaster of a lumber company, in his own home in Cecil County, Maryland, on Friday, December 19, 1947 at about 3 P. M. Holmes plead "guilty", Barber "not guilty", whereupon the court granted a severance and the trial of Barber proceeded before the court and a jury, resulting in a verdict of "guilty", with a recommendation of mercy. After a motion for a new trial had been overruled, the court sentenced Barber to the Maryland State Reformatory for Males "for an indeterminate period of time, not to exceed four years". From that judgment and sentence the appeal comes here.

Hamilton and his wife both testified that on December 19, 1947, at a few minutes after 3 P. M., two men, armed with pistols and dressed in tan, overalls, with masks, of a greenish, knitted material over their heads and faces, entered the house. Hamilton was sitting in the dining-room sorting pay-roll money on a card table. The eyeholes in the masks were sufficiently large for both Hamilton and his wife to observe that both men were white, one having blue eyes and one brown. The brown-eyed man laid his pistol on the table and started to pick up the money. Hamilton grabbed the pistol, and a scuffle ensued. He called to his wife to call the police. She went to the telephone and called the sheriff. The blue-eyed man picked up some of the money and made for the kitchen door, Mrs. Hamilton pursuing him with a broom. He knocked her down and made his escape. She then went to her husband's assistance, and hit the brown-eyed man over the head repeatedly with the broom handle. The brown-eyed man finally hit Mr. Hamilton over the head

with the pistol and escaped through the kitchen door. No shots were fired.

At the trial both Mr. and Mrs. Hamilton testified that Barber's eyes were very similar to those of the brown-eyed man, the same color and the same expression. A police officer testified that when he arrested Barber the day after the robbery, he had a bump on his head, and an abrasion behind his left ear. Irvin Holmes took the stand and testified against Barber. Although a co-defendant, his testimony was clearly competent. *Kinnard v. State,* 183 Md. 377, 383, 38 A. 2d 92. He testified that he had participated in the robbery, in company with Barber; that Barber had planned it and furnished him with a pistol and mask, made from an old army undershirt, and a suit of old army clothing to put over his own. They started from a diner where Barber worked, which was owned by Barber's father and located a short distance from the Hamilton home. Holmes returned there after the robbery and waited for Barber, then went off with Leonard Holmes, his brother, in their truck. On his way back to the diner he threw the army clothing in the creek, and the mask in the woods or creek. He "lost" the pistol in the woods. After he had been arrested and had made a statement to the State police, he took them to the creek where the clothing was found, but not the mask or pistol. Some of the payroll money was also found in the woods.

The defense was based upon an alibi. Barber took the stand and denied any knowledge of the crime. He testified that he was not well and had gone to bed in the basement under the diner at about 2:40 P. M. and gone to sleep. He was called by Albert Kist, the short-order cook, about 6 P. M. Kist testified he sat in Barber's room from about 3 P. M. until about 4 P. M. His story was also verified by Barber's sister, Dorothy Johnson, who worked in the diner, and to some extent by his brother-in-law, Ernest Johnson. The jury evidently did not believe this story. Several character witnesses testified for

Barber, who also proved that he had received an honorable discharge from the army.

Sheriff Boyd testified that he drove to the scene of the crime in response to a telephone call from Mrs. Hamilton, and called in the State police. Irvin Holmes was arrested on Saturday and made a statement at the Cecil County jail. At that time Barber was in the jail at Bel Air in Harford County. On Sunday morning Holmes, in company with the witness and officers Rudy and Hahn, led them to the place in the creek where the army clothing was found. On Monday, with Holmes and Barber, they went over the same ground. The witness was asked whether the statement made by Holmes was read in the presence of Barber. Over objection, he replied that it was. The witness explained that Barber was not present when the statement was made. He was then asked if the statement was later read to Barber, and without objection, replied that it was read to Barber at the county jail, "and he had nothing to say about it at all"; that "we informed Barber that we had a statement that implicated him in this hold-up", and that Officer Rudy read it to him.

Officer Rudy testified, without objection, that the statement made by Holmes was read to Barber on Tuesday morning; "we told him he had a perfect right to say anything he wanted to say or he had an equal right to refuse to say anything",—that Barber said "I have nothing to say". The only objection made was to a question as to where this conversation took place. The witness also testified that they all went to the spot on the creek where the army clothing was found; that they showed the trousers to Barber and asked him if they were his trousers and he said "I have nothing to say". They asked Holmes whose trousers they were, in the presence of Barber and he said "Barber's". At this point there was an objection and motion to strike out the answer, which was overruled.

Rudy also testified that on Friday night they located an automobile, owned by Spurgeon Barber, senior, but

customarily used by the accused and his brother-in-law, in back of a movie theatre in North East. Over objection, the State offered in evidence a piece of green knitted cloth, found in the rear seat. The witness Hamilton had previously identified the exhibit as being similar in color and texture to that worn by the robbers as masks.

In cross-examination, counsel for the accused brought out from the witness Rudy that not only was the statement made by Holmes read to the accused, but that one Herbert Alexander also made a statement, which was read to the accused, and that Barber told the witness "he wanted to make no statements unless his counsel was present". Holmes also testified, without objection, to the incident relating to the reading of his statement to the accused, and the trousers incident. The trousers were offered in evidence over objection.

Spurgeon Barber was cross-examined by the State and, without objection, testified to the reading of Holmes' statement to him, and that he told them he had nothing to say. He testified that his refusal to make a statement was based upon the advice of counsel, whom he had consulted after his first interrogation by the police but prior to his arrest, and had talked to over the telephone from the police barracks at Conowingo after his arrest. He testified that Rudy referred to his lawyer in deragatory language but nevertheless permitted Barber to talk to him. The only objection made by counsel for the accused was to a repetition of the question, which was sustained. The accused also testified, without objection, that Alexander had accused him of burning a mask, after the robbery. He denied having done this.

It seems clear that the question put to Sheriff Boyd, as to whether Holmes' statement was read in the presence of Barber, was merely preliminary. Its relevance would necessarily depend, not upon the answer to that question, but upon further questions relating to the conduct of the accused in the light of the answer elicited. Yet there were no further objections, nor any motions to strike out that or subsequent answers, and the whole subject

was explored, without objection, in the cross-examination of the accused. From the context, it would appear that the objection was based upon the previous testimony that Barber was in another jail when the statement was made. In any event, we cannot find that the accused was prejudiced by the court's ruling, in the light of subsequent testimony admitted without objection. *Davis v. State,* 189 Md. 269, 55 A. 2d 702; *Courtney v. State,* 187 Md. 1, 48 A. 2d 430; *Purviance v. State,* 185 Md. 189, 44 A. 2d 474; *Smith v. State,* 182 Md. 176, 184, 32 A. 2d 863; *Damm v. State,* 128 Md. 665, 669, 97 A. 645. The same comment applies to the question put to Officer Rudy in regard to Holmes' statement. There were no objections to testimony regarding Alexander's statement; on the contrary the first reference to it was by counsel for the accused, in his cross-examination of Rudy.

The statement made by Officer Rudy as to what Holmes said, in the presence of Barber, about the ownership of the trousers found in the creek, stands on a somewhat different footing, because there was a seasonable motion to strike it out. This court has recognized "that the failure of one to deny a definite statement, made in his presence and understood by him as charging him with fault or wrongful conduct, may be construed as an admission of the truth of the statement." *Wolfe v. State,* 173 Md. 103, 110, 194 A. 832, 836. But in *Blake v. State,* 157 Md. 75, 81, 145 A. 185, 188, the testimony of a police officer as to declarations made by the prosecuting witness when she identified the accused after his arrest on a charge of rape, was held to have been erroneously admitted, although made in the presence of the accused, who remained silent in the face of the charge. A majority of the Court felt that the statement was hearsay and "was likely to be injurious to the accused when admitted, by being taken to imply an acquiescence or confession by the accused, which would be unjustified."

It would seem that the question of admissibility should not depend upon the source of the statement, *i. e.,* whether from the person making it or from one who was pres-

ent when it was made. In either event, the significant fact is the conduct of the accused in the face of the accusation. Failure to deny the charge, under some circumstances, may permit an inference of an admission of guilt. Although the ultimate question is for the jury, a preliminary question for the court is presented. Compare *Model Code of Evidence* (Am. Law Inst.) Rule 507 (b). In some States, it has been held that if the accused is under arrest when the statement is made, it is inadmissible. *People v. Rutigliano,* 261 N. Y. 103, 184 N. E. 689. In that case, however, the error was held to be cured by the introduction of other evidence implicating the accused. The rule was affirmed in the recent case of *People v. Mleczko,* 298 N. Y. 153; 81 N. E. 2d 65. See also *State v. Battle,* Mo. Sup. 1948, 212 S. W. 2d 753. *Contra: People v. Hobbs,* 1948, 400 Ill. 143, 79 N. E. 2d 202; *Commonwealth v. Turner,* 358 Pa. 350, 58 A. 2d 61. In other States, the fact of arrest is only one of the circumstances to be considered. See *Wigmore, Evidence* (3d Ed.) Section 1072 and cases cited. The learned author states that "the better rule is to allow some flexibility according to circumstances". We have held, with reference to a confession, that the mere fact of arrest, even though illegal, does not render the confession inadmissible, if voluntarily made. *Courtney v. State,* 187 Md. 1, 48 A. 2d 430; *Frank v. State,* 189 Md. 591, 56 A. 2d 810. But even in States where the fact of arrest is not controlling, if it appears that the failure to deny is attributable to fear, the advice of counsel, or the desire to exercise an assumed or asserted right against self-incrimination, it has been held that no inference of guilt can properly be drawn. *People v. Simmons,* 1946, 28 Cal. 2d 699, 172 P. 2d 18. In the case at bar we think that the refusal of the accused to deny the charge of ownership cannot be treated as acquiescence, for he had been told by the police, as well as by his own attorney, that he had "a perfect right" to decline to make any statement. Under the circumstances, we think the court erred in declining to strike out the testimony of Officer Rudy as to what Holmes said about the ownership of the

trousers, in Barber's presence, not because it was hearsay, but because it would not support an inference of admission of guilt under the circumstances.

However the further question is presented whether the ruling constitutes reversible error. Holmes later took the stand, identified the trousers and stated without objection that they belonged to Barber. Upon this showing they were properly put in evidence. He also testified, without objection and in great detail, as to the statement he made in Barber's presence on the bank of the creek. Nor did Barber deny that the statement was made in his presence when he took the stand. Rudy's testimony to the same effect, previously admitted over objection, was merely cumulative, and under well established principles should be treated as harmless error. *Damm v. State, supra; Summons v. State,* 156 Md. 382, 144 A. 497.

The privilege against self-incrimination is protected in this State, both by constitutional provision (Art. 22, Declaration of Rights) and by Statute (Code Art. 35, Section 4). It is generally applied to adverse comment by the State upon the failure of an accused to take the stand. *King v. State,* 190 Md. 361, 58 A. 2d 663, 668. Such comment, however, may be cured by appropriate instruction by the trial court (*Smith v. State,* 169 Md. 474, 476, 182 A. 287) or waived by the accused by taking the stand. *Guy v. State,* 90 Md. 29, 33, 44 A. 997; *Brashears v. State,* 58 Md. 563, 567. Even if we assume, without deciding, that the admission of evidence tending to show a failure of the accused to deny an accusation made prior to trial but after his arrest, was not merely a violation of a rule of evidence but a violation of that privilege, we find nothing in our prior decisions to indicate that it was not within his power to waive such privilege. Compare *Glickman v. State,* 190 Md. 516, 526, 60 A. 2d 216, 221. In either event, we think the failure to object to identical testimony from another source constituted a waiver of the prior objection.

The appellant contends that the piece of cloth found in the automobile owned by his father was improperly ad-

mitted in evidence. But we have held that "a lack of positive identification of an instrument of crime affects the weight of the evidence rather than its admissibility." *Wilson v. State*, 181 Md. 1, 5, 26 A. 2d 770, 773. See also *Shanks v. State*, 185 Md. 437, 447, 45 A. 2d 85, 163 A. L. R. 931, and *Smith v. State*, 182 Md. 176, 184, 32 A. 2d 863.

The appellant contends that because references were made to written statements by Holmes and Alexander, it was incumbent upon the State to produce those statements, and offer them in evidence. But there is nothing in the record to show that any such point was raised in the Court below. Counsel for the accused appeared to be entirely familiar with what those statements contained; if he was not, he could have called for copies, *State v. Haas*, 188 Md. 63, 51 A. 2d 647, or he could have called on the State to put the statements in evidence. *Gray v. State*, 181 Md. 439, 445, 30 A. 2d 744. He made no such demands. The appellant further contends that the court erred in not admitting Alexander's statement in evidence, upon motion for new trial. We find no merit in that contention. The Court had the statement before it. There was no reason for formally introducing it in evidence at the hearing on the motion. The action of the trial court in ruling on the motion is not appealable. *O'Donnell v. State*, 188 Md. 693, 53 A. 2d 688. We find nothing in the statement that could affect the outcome, or render its exclusion an abuse of discretion.

Finally, the appellant charges, in general terms, a denial of constitutional rights to a fair trial. As we have already pointed out, since virtually all the testimony as to the conduct of the accused, when charged by his accomplice and Alexander, came in without objection, the weight and sufficiency of that testimony was for the jury. Alleged inconsistencies in some of the circumstances mentioned by Holmes in his testimony, as compared with his written statement, were too trivial to prevent the State from relying upon his testimony incriminating Barber. The unflattering reference to the counsel for the accused,

attributed to Rudy by the accused in his own testimony, and the fact that the accused was moved to the Harford County jail, because of an alleged lack of room for separate incarceration at the Cecil County jail, fall short of establishing that he was thereby deprived of his right to counsel. Nor can we find that the questioning of the accused at the scene of the robbery was improper under the circumstances. There was no suggestion of intimidation, threats or violence by the police to shake his refusal to make a statement, or to prevent his counsel from preparing his case for trial.

*Judgment affirmed, with costs.*